***NOT FOR PUBLICATION***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEROME ROBERTS, TIMOTHY WIMBUSH, and TAQUAN WILLIAMS | Crim. No. 19-134 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Before the Court is a motion filed by the Government to admit certain wiretap calls as co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). Defendants Timothy Wimbush and Taquan Williams oppose the motion. During hearings held on September 20 and 22, 2021, I granted the Government's motion, but I reserved the right to issue an opinion setting forth my reasoning. For the reasons below, the Government's motion is **GRANTED**.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

The Indictment in this case charged defendants Wimbush and Williams, among other individuals, with conspiracy to distribute heroin in violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(A). Wimbush and Williams were separately charged with unlawful possession with intent to distribute heroin in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C), as well as possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c)(1)(A).

Before the trial began on September 9, 2021, the parties filed motions *in limine*, which I resolved, in part, during a hearing held on August 19, 2021, and by way of an Order issued on August 31, 2021. ECF No. 627. In my August 31 Order, I granted the Government's motion to conditionally introduce into evidence certain wiretap calls pertinent to Wimbush and Williams, but I withheld

1

judgment as to whether the Government may play the calls to the jury, pending a decision during the trial as to whether the calls are admissible under the hearsay exception for co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). *Id.* at 3–4.

After receiving briefing from the parties, ECF Nos. 646–48, I held hearings on September 20 and 22, during which I found that the wiretap calls in Government Exhibits 1101 through 1116 are admissible against Wimbush and Williams as co-conspirator statements pursuant to Rule 801(d)(2)(E), and I reserved the right to issue an opinion further explaining my ruling. Following the close of evidence and after I ruled that the calls are admissible against Wimbush and Williams, the Government moved to dismiss Count One—charging conspiracy to distribute heroin—as to Williams, which Williams did not oppose, and Count One as to Williams has been dismissed. Williams then requested that I reconsider my decision to admit the wiretap calls against him as co-conspirator statements under Rule 801(d)(2)(E). I denied Williams' request because the statements are still admissible against him as to the remaining counts, as statements are admissible under Rule 801(d)(2)(E) even where no conspiracy is charged. *United States v. Van Scoy*, 654 F.2d 257, 263 (3d Cir. 1981) ("[W]hen a conspiracy in fact has been proved, absence of a conspiracy count in the indictment is without legal significance in determining admissibility of [a statement pursuant to Rule 801(d)(2)(E)]."); *United States v. Lara*, 181 F.3d 183, 196 (1st Cir. 1999) ("[O]ut-of-court statements of a declarant coconspirator, if made during and in furtherance of a conspiracy, are admissible for the truth of the matter asserted, regardless of whether the conspiracy furthered is charged or uncharged."). Nevertheless, to avoid any confusion on this point, I reminded the jury in my instructions that Williams is no longer charged with conspiracy, and I instructed the jurors that they may not consider acts performed by other members of the conspiracy against Williams.

With this background in place, I turn now to my decision to admit the wiretap calls against both Wimbush and Williams pursuant to Rule 801(d)(2)(E).

## II.     LEGAL STANDARD

Hearsay, which is an out-of-court statement offered to prove the truth of the matter asserted, generally is not admissible as evidence. Fed. R. Evid. 801(c), 802. However, a "statement [that] is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay and is admissible to prove the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(E).

To admit a co-conspirator statement pursuant to Rule 801(d)(2)(E), "the Government must prove by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Turner*, 718 F.3d 226, 231 (3d Cir. 2013). Under this standard, the Government must provide "reasonable grounds for concluding that, more probably than not," each of these elements is satisfied. *United States v. McGlory*, 968 F.2d 309, 337 (3d Cir. 1992).

To establish the defendant's membership in the conspiracy, "the Government may rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence." *Id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)); *United States v. Bobb*, 471 F.3d 491, 498 (3d Cir. 2006). As the Third Circuit explained in *United States v. Gambino*, this rule derives from the adoption of Federal Rule of Evidence 104(a), which recognizes that "'a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence.'" 926 F.2d 1355, 1361 (3d Cir. 1991) (quoting *Bourjaily*, 483 U.S. at 180). Furthermore, "[t]he necessary quantity of evidence to show participation [in the conspiracy] need not be great." *United States v. Castro*, 776 F.2d 1118, 1126 (3d Cir. 1985). Indeed, the Third Circuit has characterized "[t]he necessary quantum of evidence . . . as 'some,' and 'slight.'" *United States v. Provenzano*, 620 F.2d 985, 999 (3d Cir. 1980); *Castro*, 776 F.2d at 1126.

Likewise, "[t]he threshold for establishing that a statement was made in furtherance of a conspiracy is not high: 'the in furtherance requirement is usually given a broad interpretation.'" *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011) (quoting *United States v. Weaver*, 507 F.3d 178, 182 (3d Cir. 2007)). "[S]tatements between co-conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983).

### III. DISCUSSION

#### A. Admissibility Against Wimbush

Wimbush contends that the Government has not adequately established his membership in the conspiracy for purposes of admitting the wiretap calls under Rule 801(d)(2)(E). He argues that the evidence establishes, at most, a buyer-seller relationship, which is insufficient to convict a defendant of participation in a drug-trafficking conspiracy.[1] For the reasons which follow, I conclude that evidence independent of the wiretap calls, in combination with the calls themselves, adequately establishes, by a preponderance of the evidence, Wimbush's membership in a conspiracy with the following individuals: Quiana Welch, who conspired to distribute heroin with Wimbush; Jakir

---

[1] For purposes of conviction under 21 U.S.C. §846, "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish" membership in a drug-trafficking conspiracy. *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). "[T]he factors" courts consider in determining whether "a defendant was part of a conspiracy rather than in a mere buyer/seller relationship with that conspiracy include: (1) 'the length of affiliation between the defendant and the conspiracy'; (2) 'whether there is an established method of payment'; (3) 'the extent to which transactions are standardized'; (4) 'whether there is a demonstrated level of mutual trust'; (5) whether 'transactions involved large amounts of drugs'; and (6) whether the defendant purchased his drugs on credit." *Bailey*, 840 F.3d at 108 (quoting *Gibbs*, 190 F.3d at 199). However, "'even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation.'" *Gibbs*, 190 F.3d at 198 (quoting *United States v. Price*, 13 F.3d 711, 728 (3d Cir.1994)).

4

Taylor, who distributed heroin to Welch and to Wimbush, either directly or through Welch; David Antonio, who distributed heroin to Taylor; and Taques Hall, who distributed heroin to Wimbush.[2]

      1.  Evidence Independent of the Wiretap Calls

Evidence independent of the wiretap calls at issue, here, supports Wimbush's membership in a conspiracy to distribute heroin involving Quiana Welch, Jakir Taylor, David Antonio, and Taques Hall, and this evidence exceeds the relatively low threshold applicable for purposes of admissibility.

First, evidence independent of the wiretap calls at issue shows that, on September 6, 2018, Wimbush was discovered in possession of heroin bearing stamps matching those that were discovered during a search of David Antonio's home on October 25, 2018. Testimony from Detective Alex Maldonado and other independent, admitted evidence establishes that officers recovered stamps bearing the labels "Remy Martin," "Empire," "Capital One," and "Secrete," from David Antonio's house at 820 Chambers Street in Trenton, New Jersey. Testimony of Alex Maldonado ("Maldonado Test."), Trial Transcript Vol. 4, ECF No. 644 pp. 91–92, 108–10; Govt. Ex. 313. In addition, Detective Maldonado's testimony establishes that officers recovered heroin paraphernalia and packages bearing various stamps, including "Top Secret," from David Antonio's house during the same search. Maldonado Test., ECF No. 644 pp. 102–08; Govt. Ex. 303-A. This evidence further establishes that, at the time officers stopped Wimbush's vehicle on September 6, 2018, the trap compartment in his vehicle contained "57 bricks of heroin" bearing the stamps "Golden State," "Kawasaki," "Remy Martin," and "Capital One." Maldonado Test., Trial Transcript Vol. 4, ECF No. 644 pp. 65–70; Govt. Ex. 209-A; Govt. Ex. 219-B.[3] Likewise, testimony from Sergeant Eliezer

---

[2] I reach this conclusion, based on a preponderance of the evidence, for purposes of the admissibility of the calls, only.

[3] This evidence suggests that the transactions involved large quantities of heroin, which supports membership in a conspiracy rather than a mere buyer-seller relationship. *Bailey*, 840 F.3d at 108. Special Agent Rachel Kolvek testified that a "brick" of heroin recovered in this investigation

5

Ramos establishes that, at the time of the vehicle stop on September 6, 2018, Jubri West—another individual charged in this conspiracy—was a passenger in Wimbush's vehicle and was carrying heroin in his pocket bearing the stamps "Remy Martin," "Top Secret," and "Empire." Testimony of Eliezer Ramos ("Ramos Test."), Trial Transcript Vol. 5, ECF No. 659 pp. 135–42; Govt. Ex. 201.

Second, independent evidence establishes that David Antonio was distributing heroin to Jakir Taylor in the weeks before September 6, 2018, and that Jakir Taylor was distributing heroin bearing stamps matching certain stamps discovered in both David Antonio's home and the trap compartment of Wimbush's vehicle. Certain wiretap calls create a reasonable inference that David Antonio was distributing heroin to Jakir Taylor during the relevant period. *See, e.g.*, Govt. Ex. 1012 (August 10, 2018 call between David Antonio and Jakir Taylor in which Antonio tells Taylor he had "two so far," one of which was called "Obsession," and that "by tomorrow" he would "have like another two"); *accord* Govt. Ex. 1102 (August 11, 2018 call between Jakir Taylor and Taques Hall in which Taylor tells Hall he "got a hundred yesterday" and had "Obsession right now," and that his "Papi" was "'bout to give [him] another hundred today"). Other wiretap calls show that Jakir Taylor was distributing heroin between August 29 and September 4, 2018, bearing a subset of the stamps discovered during the stop of Wimbush's vehicle on September 6, 2018, either in the trap compartment or in Jubri West's pocket: "Capital One," *see* Govt. Ex. 1086; "Empire," *see* Govt. Ex. 1086; "Remy Martin," *see* Govt. Ex. 1087; and "Top Secret," *see* Govt. Ex. 1201. And, as discussed *supra*, each of these stamps was discovered in David Antonio's home in Trenton.[4]

---

typically contained 50 "single-use dose[s]." Testimony of Rachel Kolvek ("Kolvek Test."), Trial Transcript Vol. 2, ECF No. 642 p. 51. Accordingly, the 57 bricks of heroin recovered from Wimbush's car alone contained approximately 2,850 "single-use dose[s]," creating a reasonable inference that the heroin in Wimbush's vehicle was not merely for personal use and that it was purchased, at the very least, by an "occasional buyer for redistribution." *Gibbs*, 190 F.3d at 198.

[4] Certain packets of heroin in Wimbush's car bore the stamp "Top Secret," whereas stamps discovered in David Antonio's home bore the label "Secrete." Maldonado Test., ECF No. 644 pp.

Third, other evidence independent of the wiretap calls at issue creates a reasonable inference that Jakir Taylor and Taques Hall were distributing heroin to Wimbush before his arrest on September 6, 2018. In a call intercepted from the Mercer County Correctional Center on September 15, 2018 between Wimbush, Welch, and another individual called "Ghost," Wimbush stated to Welch that the "shit" that "Jak got is, uh, trash." Govt. Ex. 2005. Welch replied: "No it's not. . . . nobody I gave it to ever complained. That's why I kept getting it." *Id.* Immediately thereafter, Wimbush told "Ghost" to "holla at Buddha"—which, based on other evidence, is a nickname for Hall—and "see what the name." *Id.* Welch replied to Wimbush: "Boy you talkin' crazy on these phones." *Id.* Likewise, in a separate recorded jail call between Wimbush and Welch on September 20, 2018, Wimbush commented that "Jak still bervin' that garbage out there, yo." Govt. Ex. 2006. In the context of the other evidence discussed *supra*, establishing that Jakir Taylor was distributing heroin bearing stamps matching those discovered in Wimbush's vehicle, the jail calls further suggest that Taylor was in fact distributing heroin to Wimbush. Similarly, in the broader context of the call, Wimbush's request that "Ghost" ask "Buddha" for "the name" provides at least "some" evidence, *Provenzano*, 620 F.2d 999, that Wimbush was conspiring with Hall to distribute heroin.

Taken together, the foregoing evidence supports Wimbush's membership in a conspiracy to distribute heroin with Jakir Taylor, Quiana Welch, David Antonio,[5] and Taques Hall, and it is well beyond the "slight" amount of independent evidence required to admit the wiretap calls.

---

109–10. However, there is an exact match between the "Capital One," "Remy Martin," and "Empire" stamps discovered in Wimbush's vehicle and in David Antonio's home, and officers separately discovered heroin packets in Antonio's home bearing the stamp "Top Secret." *Id.* pp. 104–05.

[5] Although this evidence does not establish a direct connection between Wimbush and Antonio, "[t]he government 'need not prove that each defendant knew all of the conspiracy's details, goals, or other participants.'" *Bailey*, 840 F.3d 108 (quoting *United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002)).

2.     Wiretap Calls at Issue

In combination with the independent evidence discussed *supra*, the wiretap calls at issue on this motion establish, by a preponderance of the evidence, Wimbush's membership in a conspiracy to distribute heroin with Jakir Taylor, Quiana Welch, David Antonio, and Taques Hall.[6]

First, the wiretap calls confirm that Jakir Taylor was distributing heroin bearing stamps matching those on certain packets of heroin discovered in Wimbush's vehicle. Specifically, in a call between Jakir Taylor and Taques Hall on August 17, 2018, Taylor told Hall that his "Papi"—a reference to David Antonio—would have "Capital One." *See* Govt. Ex. 1104. Then, in a call between Taylor and Hall on August 30, 2018—one week before Wimbush's arrest—Taylor told Hall that he had "Capital One" and "Empire." *See* Govt. Ex. 1116. Heroin bearing both of these stamps was recovered from David Antonio's home and from Wimbush's vehicle: "Capital One" was recovered from the trap compartment, and "Empire" was discovered in Jubri West's pocket following the vehicle stop.[7]

Second, the wiretap calls demonstrate that Taques Hall was distributing heroin bearing stamps matching those on certain packets of heroin discovered in Wimbush's vehicle, that Hall was distributing heroin to Wimbush, and that Hall was seeking to purchase heroin from Wimbush. In a

---

[6] There is a reasonable inference that references in Government Exhibits 1101 through 1116, discussed *infra*, to "Young," "Young Money," and "Money," are references to Wimbush. *See, e.g.*, Govt. Ex. 1107 (September 6, 2018 call between Quiana Welch and Jakir Taylor in which Welch tells Taylor, in discussing the September 6 vehicle stop, that the car was in her "brother['s] name" and that officers "locked up" Welch's "brother," to which Taylor replied: "They locked Young up?"); Govt. Ex. 218-B (title to the vehicle pulled over on September 6, 2018, which is in Timothy Wimbush's name).

[7] Beyond the circumstantial evidence of Wimbush coming into possession of heroin bearing stamps matching those that Taylor was distributing, the calls also provide further evidence of a direct transactional relationship between Wimbush and Taylor. *See, e.g.*, Govt. Ex. 1103 (August 12, 2018 call between Jakir Taylor and Taques Hall in which Taylor asks Hall: "Where Young Money broke ass at?").

8

call between Taylor and Hall on August 10, 2018, Hall suggested that he was obtaining "Golden State" and "Kawasaki." *See* Govt. Ex. 1101. During the same conversation, directly after Taylor asked to buy "Golden State" from Hall, Hall told Taylor that "Money" wanted to "buy fifty" from Hall. *See id.* Later in the same conversation, Hall recounted a time when "Money g[a]ve [Hall] his little eight bands" and "wanted to buy a hundred," but that "[Money] didn't bring enough," so Hall "gave him his money back." *Id.* The next day, on August 11, 2018, Hall told Taylor he had "seventeen packs" of "Golden State" and that he "was gonna get three" packs of "Golden State" "from Young if he comes," *see* Govt. Ex. 1102, implying that Wimbush had "Golden State" at the time and that Hall was seeking to purchase "Golden State" from Wimbush. And then on August 17, 2018, Hall recounted to Taylor a transaction in which "Money" "wanted eighty" and gave Hall "five thousand," but Hall explained that he would not have "that shit . . . ready [until the next day]," so Wimbush took his money back. *See* Govt. Ex. 1104. This evidence establishes that Wimbush was attempting to purchase heroin from Hall at a time when Hall was distributing heroin bearing "Golden State" and "Kawasaki" stamps. In combination with the independent evidence showing that heroin bearing these same stamps was discovered in Wimbush's vehicle on September 6, 2018, there is a reasonable inference that Wimbush purchased heroin bearing the "Golden State" and "Kawasaki" stamps from Hall.

Third, the wiretap calls suggest that Hall was purchasing heroin from Taylor, and that Taylor was purchasing heroin from Hall. As discussed *supra*, during a call on August 10, 2018, Taylor sought to purchase "Golden State" from Hall. *See* Govt. Ex. 1101. In a call on September 6, 2018, Taylor then asked Hall "[h]ow many" Hall had "left," and Hall replied, "120." Govt. Ex. 1106. Taylor asked Hall to give him "thirty [or] forty." *Id.* Hall agreed, and when Taylor asked if Hall had "Golden State," Hall confirmed that he did. *Id.* Then, in a call on September 7, 2018 between Jakir Taylor and another individual charged in this conspiracy, Davias Taylor, Jakir Taylor indicated that he had

9

"Golden State," which Davias Taylor said that he wanted. Govt. Ex. 1111. These calls create an inference that Jakir Taylor in fact purchased "Golden State" from Hall after expressing his interest in that particular product during their call on August 10, 2018. Furthermore, as evidence that Hall sought to purchase heroin from Taylor, Hall told Taylor in a call on August 30, 2018: "hit me when you come out, I'm trying to grab some of them shits." Govt. Ex. 1116. Hall then asked Taylor: "What's the name of it?" *Id.* Taylor replied: "Empire and . . . Capital One," *id.*, which—again—are stamps recovered from David Antonio's home on October 25, 2018; *see also* Govt. Ex. 1110 (September 7, 2018 call between Hall and Taylor in which Hall agreed to give Taylor his "fifteen packs back" but requested that Taylor "give [Hall the] two hundred [Hall] gave [Taylor]" the day before, which Taylor declined to do, telling Hall, "I won't give you cash back, bro").

Fourth, the wiretap calls reinforce and expand upon the relationship centered on heroin distribution between Wimbush, Jakir Taylor, and Quiana Welch. During a call on September 6, 2018, Welch and Taylor discussed the stop of Wimbush's vehicle at length. *See* Govt. Ex. 1107. Both Taylor and Welch reflected their knowledge of what officers ultimately discovered in Wimbush's vehicle. *Id.* (JT: . . . they ain't find nothin though, right? QW: . . . they going to, they ain't find it yet, though."); *id.* ("QW: . . . what's in that car, it's about four hand things . . . [a]nd there's some packs in there[,] . . . like 80 in there. JT: I already know."). Taylor and Welch also conveyed their familiarity with the occupants of the vehicle. Taylor inquired about who was "locked up" following the vehicle stop, to which Welch responded: "They got Trip, Hootie, . . . Jubri [West], and [Welch's] brother [*i.e.*, Wimbush]." *Id.* Taylor asked shortly thereafter if "[t]hey locked Young up," which Welch confirmed that they had. *Id.* And when Taylor asked if "[t]hey locked all them up," Welch replied: "Yeah, . . . all four—all four of them was in the car." *Id.* Welch then went on to describe the occupants in the vehicle as part of "the team." *Id.* Taylor asked: "You said they locked Trip up, Hootie up—[.]" In response, Welch interjected: "Hootie, Jubri . . . and my brother." Immediately thereafter, Welch

10

stated: "they just took a bitch whole team out, they done aired half of the team, and shot a bitch up, and the other half of the team locked up. It's over." *Id.* Welch's and Taylor's knowledge of the contents—including heroin bearing stamps Taylor had been distributing—and occupants of Wimbush's vehicle, and Welch's understanding that the occupants—including Wimbush—were part of "the team,"[8] reinforce the reasonable inference that Wimbush was a member of a conspiracy to distribute heroin that included Welch and Taylor.[9]

The next day, September 7, 2018, Welch and Taylor spoke again about heroin distribution. Taylor began by telling Welch that his "peoples . . . from Newark . . . gave [him] some shit," which Taylor received as "a bag full of bundles" and which he described as "fire." *See* Govt. Ex. 1109. Taylor then discussed the "price," to which Welch responded: "Yeah, . . . they still be talkin' like

---

[8] Several minutes later, on a subsequent call, Taylor conveyed similar information regarding the contents and occupants of Wimbush's vehicle to another individual charged in the same conspiracy, Shaquel Rock. *See* Govt Ex. 1108. During this call, Taylor told Rock he had received a call from "Kiki," who stated that there were "six guns in the car, and eighty bricks." *Id.* Taylor's statement further confirms that "Kiki" is a nickname for Quiana Welch. Taylor also told Rock that the police were "hitting all the switches" in Wimbush's car "like somebody told them there was a box in there," and that "once they get it to where they getting it at they gonna bust that bitch open." This statement reinforces Taylor's knowledge of the trap compartment in Wimbush's vehicle.

[9] Both the "length" and nature of the "affiliation" between Wimbush, Taylor, Welch, and Hall during this period further suggest that Wimbush was a member of the conspiracy rather than a mere buyer. *See Bailey*, 840 F.3d at 108. The evidence establishes a relationship centered on heroin distribution among Wimbush, Taylor, Welch, and Hall that lasted at least from August 10 through September 6, 2018. In a wiretap call on August 10, Hall told Taylor that "Money wanna buy fifty" in response to Taylor's request to "get like ten of" Hall's "Golden State." *See* Govt. Ex. 1101. Immediately thereafter, Hall also referred to a previous encounter with "Young Money," which implied that Wimbush had attempted to purchase narcotics from Hall before August 10. *See id.* ("JT: Oh yeah, . . . he 'bout to buy fifty? TH: Mm-hmm. I went over there yesterday, he got like thirteen thousand . . . . JT: Who, Young Money? TH: Yeah, remember that day I say hey he ain't have it up front? JT: Yeah. TH: Bitch, he learnt me."). Wiretap calls on August 11 and August 17 capture further interactions evidencing narcotics transactions between Wimbush and Hall. *See* Govt. Exs. 1102, 1104. And, as discussed *supra*, on September 6, the same day heroin bearing stamps that Taylor and Hall had been distributing was discovered in Wimbush's vehicle, Welch referred to Wimbush as a member of "the team" in discussing the vehicle stop with Taylor. *See* Govt. Ex. 1107.

fourteen, thirteen." *Id.* When Welch asked Taylor if he planned to "up the price," Taylor replied that he did not. *See id.* Immediately thereafter, Taylor referred to "Empire"—confirming that this discussion likely pertained to heroin given that heroin was discovered during the investigation in this case bearing an "Empire" stamp—and Taylor told Welch that "this shit from Newark" is "better" because the supplier "don't fuck with that fentanyl shit." *Id.* Taken together, this exchange reflects a common understanding between Welch and Taylor regarding the packaging, pricing, and quality of heroin they were selling.

During the same call, Taylor and Welch also discussed the outcome of the September 6 vehicle stop. Welch explained that officers "found eight poles . . . and eighty packs." *Id.* Taylor questioned whether "[t]hey . . . [found] that big bitch," and Welch replied: "yes they did. That was in there." *Id.* Welch then stated: "But that's what I told him, I said when you ridin' with that you don't need nothin' else." *Id.* In context, given that Welch had just revealed that officers had "found eight poles . . . and eighty packs" in Wimbush's vehicle, there is a reasonable inference that Taylor's reference to "that big bitch" was in connection with the .223 caliber semiautomatic assault rifle discovered in the trap compartment, which was substantially larger than the three handguns officers also recovered.[10]

Taylor and Welch then continued to discuss the heroin they were selling on a series of calls

---

[10] These calls provide ample evidence of "mutual trust" between Wimbush, Jakir Taylor, and Quiana Welch, another factor supporting membership in a conspiracy rather than a buyer-seller arrangement. *Bailey*, 840 F.3d at 108. The calls demonstrate that Welch and Taylor had knowledge of the trap compartment in Wimbush's vehicle, the contents of the trap compartment when the vehicle was impounded on September 6, 2018, and specific types of firearms that were stored in the trap compartment. *See* Govt. Exs. 1107, 1109. This level of familiarity with the illicit contents of a secret trap compartment in Wimbush's vehicle, including items other than drugs, supports an inference of mutual trust that goes beyond what one might expect of a mere buyer and seller. Similarly, Welch and Taylor's discussion of pricing practices and whether a certain product was cut with "fentanyl," *see* Govt. Ex. 1109, demonstrates a level of mutual trust that is indicative of their membership in the conspiracy.

between September 10 and 12, 2018. *See* Govt. Exs. 1112–15. For example, during one call on September 10, Welch told Taylor she was going to "see if the young boys got more Empire, 'cause that's fire." Govt. Ex. 1113. During another call on September 10, Taylor indicated that he had "Gucci, Obsession, and Grand Theft Auto," Govt. Ex. 1112, which are all stamps recovered from David Antonio's home. Welch replied, "Grand Theft Auto and Gucci," *id.*, likely reflecting her preference for those products. Two days later, on September 12, Welch asked Taylor on another call: "Can you ask your peoples what he doin' with the bags?" Govt. Ex. 1114. Welch then explained that her "trap bought two bricks last night, and he said . . . out of all ten bundles, . . . only four of them was fire," and that "he said he felt like it's different dope." *Id.* Taylor then called Welch approximately an hour later and asked Welch: "what name was like that? Which one was that, the Gucci or the Sleepwalker?" Govt. Ex. 1115. Welch replied: "Gucci and . . . Walking Dead." *Id.* Taylor asked if "[b]oth of them" were "like that," to which Welch replied in the affirmative. *Id.* These calls create a reasonable inference that Taylor supplied heroin to Welch bearing, at a minimum, a "Gucci" stamp during the week following Wimbush's arrest.

* * *

In combination with the independent evidence discussed *supra*, the wiretap calls create a reasonable inference that Wimbush was purchasing large quantities of heroin from Hall and Taylor—some of which Antonio supplied—over at least a monthlong period; that Taylor and Welch had intimate familiarity with Wimbush's narcotics operations, including the heroin and firearms stored in a secret trap compartment in his vehicle; and that Wimbush was a member of a "team" dedicated to heroin distribution that included Taylor and Welch.[11] As such, the independent evidence and the

---

[11] The evidence does not establish, one way or the other, "whether there [wa]s an established method of payment" and "the extent to which transactions [we]re standardized," and as such, I view these factors as neutral in assessing whether Wimbush was a mere buyer. *Bailey*, 840 F.3d at 108. There is evidence that Wimbush did not typically purchase narcotics on credit, *see* Govt. Ex. 1101 (suggesting

13

wiretap calls establish Wimbush's membership in a conspiracy to distribute heroin by a preponderance of the evidence, sufficient to admit the calls against Wimbush under Rule 801(d)(2)(E).

### B. Admissibility Against Williams

Williams also argues that the Government has not adequately demonstrated his membership in the conspiracy. In comparison to Wimbush, against whom the evidence is substantial, Williams' membership is a closer question. Nevertheless, between evidence independent of the wiretap calls showing that Williams supplied ammunition to members of the conspiracy, as well as wiretap calls suggesting that Williams was a member of a narcotics distribution "team" that included Jakir Taylor, Quiana Welch, and Wimbush, the evidence of Williams' membership is sufficient to admit the wiretap calls against him as co-conspirator statements under Rule 801(d)(2)(E).

#### 1. Evidence Independent of the Wiretap Calls

Evidence independent of the wiretap calls surpasses the low threshold necessary to admit the calls against Williams as a co-conspirator under Rule 801(d)(2(E). The evidence shows that Williams entered Wimbush's vehicle on September 6, 2018, carrying a bag that contained ammunition and magazines matching one of the firearms recovered from the trap compartment of Wimbush's vehicle. Maldonado Test., ECF No. 644 pp. 48–51; Ramos Test., ECF No. 659 pp. 155–60. The evidence also shows that the bag Williams carried into the vehicle was recovered either from inside the trap compartment or under the back seat cushion, where the trap compartment was located. *See* Ramos Test., ECF No. 659 pp. 155–60 (testifying that the bag was not visible upon an initial inspection of the vehicle's interior and that Detective David Ordille located the bag underneath the back seat after

---

that Hall would not sell to Wimbush because he did not bring enough money), which counts against his membership in the conspiracy. *See Bailey*, 840 F.3d at 108. Nevertheless, I do not find this factor to be dispositive given the other substantial evidence of his membership.

a canine alerted for narcotics following a vehicle sniff). Williams rode in the front seat of the vehicle, Maldonado Test., ECF No. 644 p. 52, and therefore he probably did not place the bag underneath the back seat himself. Nevertheless, Williams was likely aware of the firearms in the vehicle given that he was carrying ammunition and magazines matching one of the firearms discovered in the trap compartment. Furthermore, the law recognizes that firearms and narcotics distribution are often connected. *United States v. Bonner*, 874 F.2d 822, 824 (D.C. Cir. 1989) ("[T]he law . . . recognize[s] that substantial dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia.") (internal quotations and citations omitted). Given that the firearm for which Williams supplied ammunition was recovered from the same hidden trap compartment as the 57 bricks of heroin, there is a reasonable inference that Williams was aware of the heroin in Wimbush's vehicle, as well.

### 2. Wiretap Calls at Issue

While the independent evidence is enough to surpass the low threshold applicable in the Third Circuit, *see Castro*, 776 F.2d at 1126, the wiretap calls support Williams' membership in the conspiracy for purposes of admissibility under Rule 801(d)(2)(E). As discussed in reference to Wimbush, *supra*, during a call on September 6, 2018, between Quiana Welch and Jakir Taylor, Welch recounted the September 6 vehicle stop and explained that "Trip, Hootie, . . . Jubri [West]," and Wimbush had been "locked up." Govt. Ex. 1107. Shortly thereafter, Taylor asked Welch if "[t]hey locked all them up," to which Welch replied: "Yeah, all four—all four of them was in the car." *Id.* Given that there were four people in the vehicle, there is a reasonable inference that Williams is either "Trip" or "Hootie." Taylor then asked again, "[y]ou said they locked Trip up, Hootie up—[,]" and Welch interjected, "Hootie, Jubri[,] . . . and my brother [Wimbush]." *Id.* Welch then stated: "they just took a bitch whole team out, they done aired half of the team, and shot a bitch up, and the other half of the team locked up." *Id.* In context, Welch's statement that half of "the team" had been locked

15

up encompasses Williams as a "team" member.

Furthermore, the wiretap calls also illustrate Jakir Taylor's familiarity with Williams and concern that he had been arrested. During the call with Welch on September 6, on multiple occasions, Taylor implicitly asked whether Williams was one of the arrestees and demonstrated knowledge of Williams' nickname, "Trip" or "Hootie." *See id.* (JT: They locked all them up? What they all was in the car or they just got locked up? . . . JT: You said they locked Trip up, Hootie up—"). Likewise, during a call on the same day with Shaquel Rock, Taylor relayed: "You know they just locked Young Money up, the boy Trip, the little . . . one . . . with the glasses[,] . . . [and] Whootie." Govt. Ex. 1108. Taylor then explained that there were "six guns in that car, and eighty bricks[,] . . . [s]o you know it's over, . . . they ain't none of them comin' home." *Id.* Taylor's familiarity with Williams and expression of concern that he had been arrested while discussing the heroin discovered in Wimbush's vehicle reinforces the reasonable inference, for purposes of admissibility under Rule 801(d)(2)(E), that Williams was a member of "the team," and as such, a member of a conspiracy that included Taylor, Welch, and Wimbush.[12]

## IV.   CONCLUSION

For the reasons set forth above, the Government's Motion is **GRANTED**. An appropriate form of Order is filed herewith.

---

[12] Neither Wimbush nor Williams contend that the wiretap calls were not made "in furtherance," or "in the course," of the conspiracy. Indeed, the calls easily satisfy both elements. On each call, based on a preponderance of the evidence, a co-conspirator either informed another co-conspirator of the specific heroin products he or she would be acquiring or distributing, discussed the price or quality of their products, or provided information regarding the status of other co-conspirators vis-à-vis law enforcement. Accordingly, the calls "serve[d] to maintain trust and cohesiveness among" the co-conspirators or to "inform each other of the current status of the conspiracy," which means that the calls were "in furtherance" of the conspiracy. *Ammar*, 714 F.2d at 252. Furthermore, each of the calls occurred at a time when co-conspirators were conspiring to distribute heroin. Thus, the calls occurred "in the course" of the conspiracy.

16

Date: October 7, 2021  /s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge