**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEROME ROBERTS, TIMOTHY WIMBUSH, and TAQUAN WILLIAMS | Crim. No. 19-134 (FLW)<br><br>**OPINION** |

**<u>WOLFSON, Chief Judge</u>:**

Before the Court are motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure filed by defendants Jerome Roberts, Timothy Wimbush, and Taquan Williams ("Defendants"). All three defendants were charged in a Third Superseding Indictment with conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846 (Count One). Roberts was separately charged with unlawful distribution and possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count Two). Wimbush and Williams were separately charged with possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Three); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four); and possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Five).

The case proceeded to trial, and the parties filed their Rule 29 motions after the close of evidence. Roberts moved for judgment of acquittal on Counts One and Two; Wimbush moved for judgment of acquittal on Counts One and Four; and Williams moved for judgment of acquittal on Counts One, Three, and Four. The Court then held a hearing during which it reserved judgment on the Rule 29 motions as to all counts except Count One against Williams. Before the jury began

deliberating, the Government moved to dismiss Count One against Williams, which the Court granted. The jury reached a verdict in the first phase of the trial, which covered Counts One through Four, on October 8, 2021. On Count One, the jury found Roberts and Wimbush guilty; on Count Two, the jury found Roberts guilty; and on Counts Three and Four, the jury found Wimbush guilty and Williams not guilty. After the second phase of the trial, which covered Count Five, the jury found both Wimbush and Williams guilty. For the reasons set forth herein, Defendants' motions are **DENIED**.[1]

## I.   BACKGROUND AND PROCEDURAL HISTORY

Below I set forth the background in this case relevant only to the present motions.

On February 27, 2020, a Third Superseding Indictment charged Roberts, Wimbush, and Williams, among others, with multiple counts pertaining to narcotics possession and distribution, and in the case of Wimbush and Williams, unlawful possession of firearms. Third Superseding Indictment, ECF No. 452. A Third Superseding Indictment containing counts that were re-numbered for purposes of trial in this case charged the following offenses: Count One charged Roberts, Wimbush, and Williams, among others, with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846; Count Two charged Roberts with distribution and possession with intent to distribute 100 grams or more of heroin, in

---

[1] Because the Court dismissed Count One against Williams during the trial, and the jury found Williams not guilty on Counts Three and Four, Williams' motion for judgment of acquittal on Counts One, Three, and Four is moot. *See, e.g.*, *United States v. Ferriero*, Crim. No. 13-592, 2015 WL 7737341, at *1 n.1 (D.N.J. Dec. 1, 2015) ("Because Ferriero was acquitted of Counts Two and Four, his motion for acquittal with respect to those counts is moot."); *United States v. Baukman*, Crim. No. 05-440-8, 2010 WL 3448202, at *2 n.1 (E.D. Pa Aug. 31, 2010) ("Since the jury returned a verdict of not guilty on Count 187, Baukman's Rule 29(a) motion is moot with regard to that count."); *United States v. Atl. States Cast Iron Pipe Co.*, Crim. No. 03-852, 2007 WL 2282514, at *82 (D.N.J. Aug. 2, 2007) (holding Rule 29 motion filed during trial was moot as to a particular count given the jury's verdict of not guilty on that count).

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Count Three charged Wimbush, Williams, and Jubri West—an individual charged in the same drug conspiracy but whose case did not proceed to trial with Roberts, Wimbush, and Williams—with possession with intent to distribute a quantity of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); Count Four charged Wimbush, Williams, and West with possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and Count Five, which was bifurcated, redacted from the charging instrument, and set for a separate trial following the trial on Counts One through Four, charged Wimbush and Williams with possession of firearms by convicted felons, in violation of 18 U.S.C. § 922(g)(1). Re-Numbered Third Superseding Indictment, ECF No. 677.

The case proceeded to trial on September 9, 2021, and the Government presented evidence including testimony from various investigators and experts, wiretap calls, text messages, and physical evidence, in support of its case in chief. With respect to Roberts, the Government maintains that the evidence establishes his membership in a conspiracy to distribute heroin in and around Trenton, New Jersey, in August and September 2018. The Government contends that the conspiracy included David Antonio, who allegedly supplied heroin to Roberts, and Jakir Taylor, to whom Roberts allegedly supplied heroin for redistribution. To establish Roberts' membership in the conspiracy, the Government introduced wiretap calls among Antonio, Taylor, and Roberts, allegedly capturing their plans to conduct heroin transactions. In addition, the Government presented physical evidence recovered from Antonio's home during a search on October 25, 2018, including heroin allegedly packaged for distribution and stamps matching those that Antonio, Taylor, and Roberts discussed placing on heroin packages during the wiretap calls. The Government also presented evidence that Roberts participated in a transaction on August 10, 2018, through which he procured more than 100 grams of heroin from Antonio and redistributed at least 100 grams to Taylor and another individual, Kaleib Cox.

With respect to Wimbush, the Government maintains that certain wiretap calls and physical evidence recovered from his vehicle following a law-enforcement stop on September 6, 2018, prove his guilt on Counts One, Three, and Four. In particular, the Government introduced wiretap calls between Taylor and two other individuals who were allegedly engaged in heroin distribution—Taques Hall and Quiana Welch—that allegedly establish Wimbush's membership in the conspiracy. According to the Government, the wiretap calls between Taylor and Hall show that Wimbush had been procuring heroin from Hall in August and September 2018. The Government also maintains that the wiretap calls between Taylor and Welch show that, in August and September 2018, Wimbush procured heroin from Taylor, either directly or through Welch, which Taylor had procured from Antonio. In addition, following the stop of Wimbush's vehicle on September 6, 2018, officers discovered bricks of heroin in a trap compartment hidden under the back seat bearing stamps matching those which, according to the Government, Antonio, Taylor, and Hall had been distributing in the previous weeks. Officers also discovered firearms, including a semi-automatic assault rifle and three handguns, in the trap compartment next to the bricks of heroin.

Finally, the Government presented evidence pertinent to the charges against Williams in Counts One, Three, and Four. In particular, the Government presented testimony from Officer Alexander Maldonado, who assisted in the investigation underlying this case. Officer Maldonado testified that he observed Williams enter Wimbush's vehicle on September 6, 2018, carrying a yellow bag, which officers later recovered from Wimbush's vehicle, and which contained ammunition matching that of a firearm discovered in the trap compartment. The Government also presented wiretap calls between Taylor and Welch that, according to the Government, establish Williams' membership in a conspiracy to distribute heroin that included Taylor, Welch, and Wimbush.

On September 23, 2021, after the close of evidence, Williams filed a Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(a) as to Counts One, Three, and Four

against him. Br. of Def. Taquan Williams in Support of Motion for Judgment of Acquittal (Sept. 23, 2021), ECF No. 652. Williams contends that the Government failed to prove his membership in a conspiracy, requiring acquittal on Count One, or that he possessed the heroin in the trap compartment of Wimbush's vehicle, requiring acquittal on Counts Three and Four. The Court held a hearing on September 24, 2021, during which Wimbush moved pursuant to Rule 29 for acquittal on Counts One and Four, and Roberts moved for acquittal on Counts One and Two. Trial Transcript ("Tr.") 975:1–4, 992:6–9, 995:23–996:2. Wimbush contends the Government failed to prove that he participated in anything more than a buyer-seller arrangement, which is insufficient to convict him of conspiracy under Count One, or that he possessed firearms in furtherance of any drug trafficking crime, requiring acquittal on Count Four. Roberts similarly maintains that the evidence against him establishes merely a buyer-seller arrangement, and he also contends that the Government impermissibly charged multiple conspiracies, requiring acquittal on Count One. With respect to Count Two, Roberts argues the evidence fails to establish that he distributed, or possessed with intent to distribute, 100 grams or more of heroin, as charged in the indictment. After hearing arguments from the parties, the Court reserved judgment pursuant to Rule 29 as to each count except Count One against Williams. Tr. 1034:23–1035:7. Following the Rule 29 hearing, the Government moved to dismiss Count One against Williams, which the Court granted on September 29, 2021. ECF No. 662; Tr. 1040:1–18.

The jury issued its verdict in the first phase of the bifurcated trial on October 8, 2021. ECF No. 684. The jury found both Roberts and Wimbush guilty on Count One. *Id.* at 1. It found that the quantity of heroin involved in the conspiracy that was reasonably foreseeable to Roberts was one kilogram or more. *Id.* With respect to Wimbush, the jury found that the quantity of heroin involved in the conspiracy that was reasonably foreseeable was 100 grams or more, but not one kilogram or more. *Id.* at 4. The jury found Roberts guilty on Count Two, and it found that the weight of the substance containing a detectable amount of heroin that Roberts distributed, or possessed with intent

to distribute, was 100 grams or more. *Id.* at 5–6. On Counts Three and Four, the jury found Wimbush guilty, but it found Williams not guilty. *Id.* at 7–8. After the jury issued its verdict on Counts One through Four, the Court held a separate trial on Count Five, on which the jury found both Wimbush and Williams guilty. ECF No. 686.

## II.   LEGAL STANDARD

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Having reserved decision on Defendants' motions, the Court "must decide the motion[s] on the basis of the evidence at the time the ruling was reserved," Fed R. Crim. P. 29(b), *i.e.*, at the end of the Government's case and then at the end of the entire case. *See* Tr. 962:22–963:9; ECF No. 652; Tr. 973:10–13 (noting, after close of evidence from both sides, that the Court would hear Defendants' Rule 29 motions "both as if made at the end of the [G]overnment's case and then as if made at the end of the entire case").

In reviewing a motion pursuant to Rule 29, the Court "must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt based on the available evidence.'" *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir.2002)). The Court must "not view the [G]overnment's evidence in isolation, but rather, in conjunction and as a whole." *Id.* at 134; *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) ("This court must determine whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let the jury find him guilty beyond a reasonable doubt.") (quotations omitted). "[I]n evaluating the evidence, the 'district court cannot . . . weigh the evidence . . . [or] make credibility determinations.'" *United States v. Picciotti*, 40 F. Supp. 2d 242, 245 (D.N.J. 1999) (quoting *United States v. Giampa*, 758 F.2d 928, 934–35 (3d Cir.1985)). The Third Circuit has described this standard

as "particularly deferential" and has warned that courts "'must be ever vigilant . . . not to usurp the role of the jury.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (quoting *Brodie*, 403 F.3d at 133).

## III.   DISCUSSION

### A.   Count One

To prove the conspiracy count against Roberts and Wimbush, "the government must establish: (1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (citing *United States v. Gibbs*, 190 F.3d 188, 197(3d Cir. 1999)).[2] "[T]he government is entitled to prove these elements entirely through circumstantial evidence," and the court may "infer such a conspiracy when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities 'except as the result of a preconceived

---

[2] Consistent with *Bailey* and the Third Circuit Model Jury Instructions, the Court instructed the jury that the Government must prove the following elements beyond a reasonable doubt in order to find a particular defendant guilty under Count One:

> *First*: That two or more persons agreed to distribute or possess with the intent to distribute heroin;
>
> *Second*: That a particular defendant was a party to or a member of that agreement;
>
> *Third*: That a particular defendant joined the agreement or conspiracy knowing of its objectives to distribute or possess with intent to distribute heroin, and intending to join together with at least one other alleged conspirator to achieve those objects; that is, that a particular defendant shared a unity of purpose and the intent to achieve those objectives; and
>
> *Fourth*: That the weight of the mixture or substance containing heroin was one kilogram or more.

Tr. 1087:11–1088:2. With respect to the fourth element, concerning weight, the Court also instructed the jury on the lesser-included offenses of "conspiracy with intent to distribute 100 grams or more[,] . . . [or] a quantity (*i.e.*, less than 100 grams) of a mixture or substance containing a detectable amount of heroin." Tr. 1103:12–25. I will refer to these elements in assessing the sufficiency of the evidence under Count One against Roberts and Wimbush.

scheme or common understanding.'" *Id.* (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)). Further, "[t]he Government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." *United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002).

"In drug conspiracy cases, the government must prove that the defendants were not merely engaged in 'buyer-seller' relationships with their suppliers." *Bailey*, 840 F.3d at 108 (quoting *Gibbs*, 190 F.3d at 197). Factors which demonstrate that a "defendant was *part* of a conspiracy rather than in a mere buyer/seller relationship with that conspiracy include: (1) 'the length of affiliation between the defendant and the conspiracy'; (2) 'whether there is an established method of payment'; (3) 'the extent to which transactions are standardized'; (4) 'whether there is a demonstrated level of mutual trust'; (5) whether 'transactions involved large amounts of drugs'; and (6) whether the defendant purchased his drugs on credit." *Id.* (quoting *Gibbs*, 190 F.3d at 199). "However, . . . 'even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation.'" *Gibbs*, 190 F.3d at 198 (quoting *United States v. Price*, 13 F.3d 711, 728 (3d Cir.1994)).

       1.    *Roberts*

       a)    Elements One and Two: Agreement and Membership

With respect to the first and second elements, the Government presented sufficient evidence from which the jury could find both an agreement to distribute heroin, as well as Roberts' membership in that agreement. Several groups of evidence support this conclusion.[3]

_____

[3] In its opening, the Government represented that Jakir Taylor would testify as a cooperating witness for the prosecution and that Taylor's testimony would confirm the Government's other evidence supporting the charges against Roberts, Wimbush, and Williams. *See* Tr. 59:16–60:7. Taylor ultimately refused to testify. Nevertheless, even without Taylor's testimony, I find the evidence

First, certain wiretap calls, testimony, and physical evidence establish that, on or around August 10, 2018, Antonio agreed to supply approximately 400 bricks of heroin[4] to Roberts, who would then redistribute those bricks to Taylor and others. Wiretap calls involving Antonio, Taylor, and Roberts capture their plans to execute this transaction. On August 9, 2018, at 4:14 p.m., Antonio told Taylor he provided a "little sample" to an individual Taylor called "Bro." *See* Government Exhibit ("Govt. Ex.") 1009. In context, that individual was Roberts, as one minute after the call between Taylor and Antonio, Taylor asked Roberts about the "sample" Antonio had provided. *See* Govt. Ex. 1010. On the same call, Roberts informed Taylor that Antonio was preparing at least 400 bricks of heroin. *See id.* ("JR: . . . he's trying to get at least four hundred ready.").[5] The following day, on August 10, 2018, at 9:42 a.m., Antonio informed Taylor that he had "two so far" and would have "another two" by the next day, August 11. *See* Govt. Ex. 1012. When Taylor asked Antonio "the names" Antonio planned to use, Antonio replied, "Scarface and Obsession." *Id.* At 1:01 p.m. on August 10, Taylor relayed to Roberts that Antonio would have "two" that day and another "two" the following day. *See* Govt. Ex. 1013. Later on the afternoon of August 10, Roberts then asked Taylor to have someone meet him at a certain "car wash" in Trenton. *See* Govt. Ex. 1014. Several minutes later, Taylor directed a female associate to drive to a car wash on Lalor Street in Trenton, *see* Govt. Ex. 1015, and just minutes after that call, Taylor informed Roberts that the female was "on her way right now." *See* Govt. Ex. 1016. At 4:22 p.m. on August 10, Taylor informed Roberts that he had just

---

discussed herein sufficient as to the counts against Roberts and Wimbush.

[4] Special Agent Rachel Kolvek, the lead agent overseeing the Government's investigation, testified that based on her experience in this case, a "brick" typically consisted of 50 single-use doses of heroin. Testimony of Rachel Kolvek, Tr. 89:2–19.

[5] Although Roberts does not refer explicitly to "bricks" or "heroin," a rational jury could draw such an inference when viewing Roberts' statement in the context of other evidence discussed *infra*.

arrived in the area where Roberts was waiting. *See* Govt. Ex. 1017.

In combination with the wiretap calls discussed *supra*, testimony from detectives who conducted surveillance near the Lalor Street car wash on August 10, 2018, provide sufficient evidence from which a rational jury could conclude that the transaction involving Antonio, Taylor, and Roberts actually occurred. Officer Maldonado, who was part of the task force investigating this case, testified that he established surveillance near the Lalor Street car wash after officers intercepted the calls during which Roberts arranged to meet Taylor and his female associate on the afternoon of August 10. *See* Testimony of Alexander Maldonado, Tr. 365:2–369:13. Officer Maldonado testified that he observed Roberts drive past him near the Lalor Street car wash in his silver Mercedes Benz[6] while using a cell phone. *See* Tr. 369:14–371:5. Several minutes later, Officer Maldonado testified that Roberts drove back towards him, pulled over near where Officer Maldonado had parked, and counted U.S. currency while sitting in his vehicle. *See* Tr. 371:13–372:25.[7] Shortly thereafter, Officer Maldonado testified that a black Jeep Grand Cherokee parked in front of Roberts and that a Black male exited the vehicle, entered the front passenger seat of Roberts' Mercedes, and then exited Roberts' vehicle carrying a square object underneath his shirt, which "appeared to be a package of heroin" based on its shape. *See* Tr. 372:19–373:18. According to Officer Maldonado, the man who entered Roberts' vehicle was Kaleib Cox. *See* Tr. 373:19–374:14. Officer Maldonado testified that

---

[6] The Government established through other evidence that Roberts owned and operated a silver Mercedes Benz C300. *See, e.g.*, Tr. 118:20–122:25, Govt. Ex. 3301-A and 3301-B (registration and title to silver Mercedes in Jerome Roberts' name), Govt. Ex. 3301-C (depicting the silver Mercedes discovered at Roberts' home the day of his arrest). Officer Maldonado recognized this Mercedes as the vehicle he saw Roberts driving on August 10, 2018. *See* Tr. 369:14–370:19.

[7] Officer Maldonado did not testify that he observed Roberts meet with Taylor near the car wash, but rather that another surveillance officer observed that meeting. *See* Tr. 371:9–12. No defendant objected to this statement, but because it is hearsay, the Court will not rely on it in determining the sufficiency of the evidence pertaining to whether Roberts supplied heroin to Taylor on August 10.

Cox then returned to Roberts' vehicle and handed Roberts "what appeared to be money." Tr. 374:18–22.

After Cox pulled away, Officer Maldonado testified that he followed Cox down several streets until Detective Jeffrey Donaire took over the surveillance of Cox's vehicle. Tr. 375:18–378:16. Detective Donaire testified that, after he engaged the flashing lights on his vehicle, Cox accelerated to a high speed and ran several red lights before crashing into two other cars. *See* Testimony of Jeffrey Donaire, Tr. 662:15–666:5. When Detective Donaire pulled Cox out of his vehicle, he testified that Cox was holding a "sheet of heroin" consisting of approximately 50 bricks, and he testified that the bricks were marked "Scarface" and "Obsession." Tr. 666:8–671:1; *see also* Govt. Ex. 101 (consisting of the heroin stamped "Scarface" and "Obsession" recovered from Cox on August 10, 2018); Testimony of Lisa Mangione, Tr. 696:3–6 (testimony of expert witness that Government Exhibit 101 consisted of approximately 50 bricks of heroin). Several days after Cox was arrested, Roberts notified Taylor that Cox accused Roberts of trying to set him up, supporting the conclusion that Roberts had supplied Cox with heroin on August 10. *See* Govt. Ex. 1031 (August 14, 2018 call between Taylor and Roberts in which Roberts explained that a man called "Lito" accused Roberts of trying to set him up with the police); Govt. Ex. 1032 (August 14, 2018 call between Taylor and Roberts in which Roberts recalls that the man's last name is "Cox"). Further, in the two days following August 10, the wiretap intercepted Taylor discussing the 100 bricks of heroin he had just received from Antonio through Roberts. *See* Govt. Ex. 1102 (August 11, 2018 call between Taylor and Taques Hall in which Taylor tells Hall that he, Taylor, "had got a hundred" the day before from his "Papi");[8] Govt. Ex. 1020 (August 11, 2018 call between Taylor and Roberts in which Taylor

---

[8] A rational jury could conclude based on the wiretap calls that Roberts' and Taylor's references to "Pop" and "Papi" were references to Antonio. *See, e.g.*, Govt. Ex. 1012 (call between Taylor and Antonio in which Taylor refers to Antonio as "Pop"); Govt. Ex. 1021 (same); Govt. Ex. 1034 (August 14, 2018 call between Taylor and Antonio on which Antonio tells Taylor he planned to supply

indicates Antonio would have another "two" shortly, notifies Roberts that "[t]hat shit good," and explains that he "should be done with these shits tomorrow"); Govt. Ex. 1021 (August 12, 2018 call between Taylor and Antonio in which Taylor asks Antonio to remind him of "the new names that [Antonio] gave [Taylor] besides Obsession," to which Antonio replied, "Scarface," among others). In context, the wiretap calls and testimony could establish, by circumstantial evidence, that Antonio, Taylor, and Roberts reached and executed an agreement under which Antonio supplied 200 bricks of heroin stamped "Scarface" and "Obsession" to Roberts, and Roberts supplied 100 of those bricks to Taylor[9] and 50 to Cox.

Second, wiretap calls and testimony provide sufficient evidence upon which a rational jury could find that Roberts participated in another heroin transaction involving Antonio and Taylor on August 13, 2018. On the evening of August 11, 2018, Roberts told Taylor that he was waiting for "old boy"—in context, a reference to Antonio—to supply Roberts with "some more" in approximately an hour, and Taylor informed Roberts that Antonio told Taylor "he had like two." *See* Govt. Ex. 1020.[10] The following day, while discussing "Obsession" and "Scarface," Taylor asked Antonio whether he had given "bro"—in context, a reference to Roberts—"three," which Antonio

---

"thirteen hundred[] or fourteen hundred"); Govt. Ex. 1035 (August 15, 2018 call between Roberts and Taylor on which Roberts informs Taylor he "just got off the phone . . . Pop," who was "talkin' 'bout some big shit," to which Taylor replied, "I know[,] [h]e told me[] like fourteen hundred").

[9] Another wiretap call reinforces the inference that Roberts distributed heroin to Taylor on August 10, 2018. In discussing Cox's arrest, Roberts described it to Taylor as occurring on the day "when I met you . . . and I gave you that shit." *See* Govt. Ex. 1032.

[10] The jury could reasonably conclude that Roberts' reference to "old boy" was a reference to Antonio. Immediately after Roberts referred to "old boy," Taylor said "I talked to him earlier" and "he said like two." *See* Govt. Ex. 1020. Further, on another call three hours earlier between Taylor and Antonio, Taylor asked Antonio for his "count," and Antonio replied, "it should be . . . [a]nother two." *See* Govt. Ex. 1019.

confirmed. *See* Govt. Ex. 1021.[11] Then on August 13, Taylor asked Roberts to bring him "the other half," and the two agreed to meet. *See* Govt. Ex. 1022. At 4:05 p.m. that day, Roberts directed Taylor to arrange for a female, later identified as Latrice Wharton, to meet Roberts near Helene Fuld Hospital in Trenton. *See* Govt. Exs. 1023, 1024. Seventeen minutes later, Taylor directed Wharton to meet Taylor's "uncle . . . Righteous"—in context, a reference to Roberts—near Helene Fuld. *See* Govt. Exs. 1025, 1027. And at 4:33 p.m., Taylor informed Roberts that Wharton was driving a gold-colored car, and Roberts confirmed that he was driving his silver car. *See* Govt. Ex. 1028. In response to these calls, which were intercepted over the wiretap, Officer Maldonado testified that he set up surveillance near Helene Fuld Hospital and observed Wharton park next to Roberts' silver Mercedes in a "golden-color Lincoln." Tr. 379:3–382:22. Officer Maldonado testified that Roberts handed Wharton a "blue-and-white bag," which Wharton placed in her trunk, and that Wharton then drove away. Tr. 382:20–384:4. Later that evening, Taylor met Wharton to collect the bag Wharton received from Roberts, which Wharton described as a "Gap bag" on a call with Taylor. *See* Govt. Ex. 1030. A rational jury could conclude, based these calls and Officer Maldonado's testimony, that Roberts procured heroin from Antonio and then supplied a portion of that heroin to Taylor via Wharton.

Third, the Government adduced evidence of an agreement among Antonio, Taylor, and Roberts, under which Antonio planned to supply approximately 1,400 bricks of heroin to Taylor and Roberts for redistribution. On August 14, 2018, Antonio informed Taylor he wanted to supply "at least thirteen . . . or fourteen hundred" in "one shot" instead of providing "two" every couple of days, to which Taylor responded: "We'll be able to flood the streets." *See* Govt. Ex. 1034. The following

---

[11] The jury could reasonably conclude that Taylor's reference to "bro" on this call was a reference to Roberts, as Roberts had indicated on the previous day that he was waiting for an additional supply from Antonio, *see* Govt. Ex. 1020, and Taylor was discussing "Obsession" and "Scarface," *see* Govt. Ex. 1021, which Roberts had procured from Antonio on August 10.

morning, on August 15, 2018, Roberts notified Taylor that he had just spoken to "Pop," who was trying to collect money in order to take on "other work," and Taylor responded that Antonio was planning to supply "fourteen hundred." *See* Govt. Ex. 1035. Later the same morning, Antonio told Taylor that he needed to collect additional funds—in context, $20,000—in order to "start with the new shit," and Antonio confirmed that he would provide "thirteen or fourteen hundred" bricks of heroin. *See* ECF No. 1036.[12] This call evidently concerned heroin, as Antonio asked Taylor if he preferred "Obsession," *see id.*, which Antonio had supplied to Roberts previously and which was stamped on the heroin packets discovered in Kaleib Cox's vehicle. While Antonio, Taylor, and Roberts did not ultimately execute their agreement to supply and redistribute 1,400 bricks of heroin,[13] success is not a necessary element of conspiracy. *See, e.g.*, *United States v. Watkins*, 339 F.3d 167, 178 (3d Cir. 2003) ("A conspiracy charge does not require proof of success in committing the offense (as does a substantive offense), only an agreement to commit it."); Third Circuit Model Jury Instructions 6.18.371G, *Conspiracy – Success Immaterial*.

Finally, the evidence demonstrates that Antonio, Taylor, and Roberts continued conspiring to distribute heroin after the 1,400-brick supply failed to materialize. During an intercepted call on August 18, 2018, Roberts informed Taylor that he was "with bro right now"—a reference to Antonio—and that Antonio had "one-thirty" but was planning to obtain "four hundred" that evening. *See* Govt. Ex. 1045.[14] Roberts then explained to Taylor that they had to help clear Antonio's debts

---

[12] The Government introduced text messages between Antonio and Taylor, and between Taylor and Roberts, reinforcing the inference that Taylor and Roberts sought to collect $20,000 for Antonio to pay back his suppliers. *See* Tr. 146:9–150:23 and Govt. Ex. 1201.

[13] The Government also introduced text messages between Taylor and Roberts evidencing their agreement to obtain 1,400 bricks of heroin from Antonio. *See* Tr. 146:9–148:21 and Govt. Ex. 1201 (text messages in which Roberts asks Taylor to "grab like 7 out the streets" and Taylor agrees, stating "Yea im tryna get that big bomb yo he said 1400 hundred").

[14] There is a reasonable inference that Roberts' reference to "bro" on this call was a reference to

with other suppliers so Antonio could obtain more heroin. *See id.* (explaining the need to "help [Antonio] out of his hole"). Taylor confirmed his willingness to assist, *see id.* ("JT: Whatever I make off . . . that shit I'm just gonna . . . give all that shit to him."), and he communicated the same message to Antonio later the same evening. *See* Govt. Ex. 1046 ("JT: . . . I'm just gonna give you all the profits off these shits and you can clear that . . . debt with your peoples so you can get this . . . ."). On August 21, 2018, Roberts informed Taylor that he obtained 225 or 251 bricks of heroin from Antonio. *See* Govt. Ex. 1048 ("JR: . . . he gave me 225 or 251."). Roberts was evidently referring to heroin, as he explained to Taylor that Antonio had provided "shit named Uber," *see id.*, which is a stamp recovered from Antonio's residence on October 25, 2018. *See* Tr. 228:10–14. On September 1, 2018, Taylor and Roberts continued discussing the need to help Antonio pay his debts. *See* Govt. Ex. 1058 ("JT: I'm trying to round up all the money. . . . Pop . . . gotta be patient . . . ."). And on September 8, 2018, after Antonio requested additional funds from Taylor, *see* Govt. Ex. 1063 ("DA: . . . I need fourteen for them."), Taylor complained to Roberts about Antonio's request, but Roberts emphasized the need to continue working with Antonio. *See* Govt. Ex. 1064 ("JR: . . . I ain't letting [Antonio] go nowhere. . . . That way we got access to that shit.").

The evidence outlined herein is sufficient for the jury to conclude that Roberts was a member of a conspiracy that included Antonio and Taylor, and not merely engaged in isolated "buyer-seller" transactions with those individuals. *See Bailey*, 840 F.3d at 108 (quoting *Gibbs*, 190 F.3d at 197). Under the first *Gibbs* factor—"the length of affiliation between the defendant and the conspiracy," *Gibbs*, 190 F.3d at 199—Roberts was captured on wiretap calls with Taylor and Antonio spanning nearly two months, from August 7 through September 22, 2018. *See* Govt Ex. 1002; Govt. Ex. 1084

---

Antonio, as Special Agent Kolvek testified that Antonio's voice is audible in the background. *See* Tr. 168:22–169:13.

(September 22, 2018 call between Taylor and Roberts in which Taylor tells Roberts he was "waiting on Pop," and Roberts tells Taylor "I just told Pop to start it"). These were not isolated interactions but rather consist of more than 50 calls on which Roberts spoke with Taylor, Antonio, or both, *see* Govt. Exs. 1001–86, as well as text messages, *see* Govt. Exs. 1201–02, and footage of Roberts visiting Antonio's residence at 820 Chambers Street in Trenton. *See* Tr. 176:21–185:1; Govt. Exs. 319, 319-A. Roberts' interactions with Antonio and Taylor also demonstrate a high "level of mutual trust" and dependence, *Gibbs*, 190 F.3d at 199, as illustrated by Roberts' and Taylor's repeated efforts to assist Antonio in paying down his debts. *See, e.g.*, Govt. Exs. 1035, 1045, 1058. And the planned transactions among Roberts, Taylor, and Antonio "involved large amounts of drugs." *Gibbs*, 190 F.3d at 199. For example, the transaction executed on August 10, 2018, involved approximately 200 bricks of heroin, *see* Govt. Ex. 1013, and another planned transaction involved 1,400 bricks. *See* Govt. Exs. 1034–36. Although "no one of [the *Gibbs*] factors alone will necessarily be sufficient— without more—to establish a mere buyer's agreement to join the conspiracy . . ., the presence of one or more of these factors," as exists here, "furthers the inference that the buyer knew that he was part of a larger operation and hence can be held responsible as a co-conspirator." *Gibbs*, 190 F.3d at 200.

Likewise, Roberts' position that the Government impermissibly charged and presented multiple conspiracies to the jury, *see, e.g.*, Tr. 995:17–22, is unavailing. "'A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant.'" *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (quoting *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir.1989)). "There is a variance if the indictment charges a single conspiracy while the evidence presented at trial proves only the existence of multiple conspiracies." *Kemp*, 500 F.3d at 287. To "determine whether a group of individuals engaged in a single conspiracy or multiple conspiracies," the Court must "consider: (1) 'whether there was a common goal among the conspirators'; (2) 'whether the agreement

contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators'; and (3) 'the extent to which the participants overlap in the various dealings.'" *Id.* (quoting *Kelly*, 892 F.2d at 259) ("*Kelly* factors").

Roberts does not state which of the three *Kelly* factors the evidence fails to satisfy, but his challenge appears to rest on the third factor. He contends that a reference in Count One of the Third Superseding Indictment to the use of firearms as a manner and means in furtherance of the conspiracy, which is pertinent only to Wimbush and Williams, could lead the jury to convict Roberts based on evidence that was not relevant to him. *See* Tr. 992:14–995:1. However, the indictment specifies that only Wimbush, Williams, and West possessed firearms in connection with the conspiracy. *See* ECF No. 677 at 7–8.[15] To the extent Roberts maintains that the evidence establishes multiple conspiracies on other grounds, Tr. 995:15–22, his position is unconvincing. Roberts' agreement with Taylor and Antonio to distribute heroin for profit is apparent from the wiretap calls and other evidence discussed *supra*. And as discussed *infra* in connection with the conspiracy count against Wimbush, Taylor connects Roberts to the other members of the conspiracy, as Taylor coordinated with them in pursuing the conspiracy's common objective of distributing heroin for profit in and around Trenton. While there is no evidence that Roberts interacted with—or was even aware of—every other individual charged in the conspiracy, including Wimbush, "[t]he government 'need not prove that each defendant knew all of the conspiracy's details, goals, or other participants.'" *Bailey*, 840 F.3d at 108 (quoting *Perez*, 280 F.3d at 343).

          b)     Element Three: Unity of Purpose and Intent to Achieve the Objectives of the Conspiracy

---

[15] As the parties agreed during the Rule 29 hearing, in order to minimize any prejudice associated with the reference to firearms under the manner and means of the conspiracy, Tr. 995:4–16, the Court issued an instruction reminding the jury "that Defendant Jerome Roberts is not charged with possessing firearms." Tr. 1085:13–14.

The foregoing evidence is also sufficient to establish that Roberts shared a "unity of purpose" and an "intent to achieve [the] objectives" of the conspiracy. Tr. 1087:11–1088:2. Such intent and unity of purpose is evident from the multiple heroin transactions Roberts, Taylor, and Antonio planned and, in some cases, executed, in August and September of 2018. *See, e.g.*, Govt. Exs. 1013 and 1102 (August 10, 2018 transaction); Govt. Ex. 1030 and Tr. 382:20–384:4 (August 13, 2018 transaction); Govt. Exs. 1034–35 (planned 1,400 brick transaction). In addition, Roberts made his intent clear through his continued efforts, in coordination with Taylor, to assist Antonio in paying his debts, which would allow Antonio to procure additional heroin that Roberts and Taylor could then sell for profit. *See, e.g.*, Govt. Exs. 1035, 1045, 1058.

> c) Element Four: Weight

Finally, the Government presented sufficient evidence from which the jury could conclude that Roberts conspired to distribute and possess with the intent to distribute one kilogram or more of heroin, which is the weight charged in the indictment. Lisa Mangione, an expert in forensic chemistry and analysis of controlled substances, Tr. 691:1–9, testified that the bricks recovered from Kaleib Cox following his meeting with Roberts on August 10, 2018, contained approximately 57 grams of heroin, which equals slightly more than one gram of heroin per brick. Tr. 697:3–19. Further, Special Agent Kolvek testified that based on her experience in this case, a brick typically contained approximately one gram of heroin. Tr. 89:20–90:2. Thus, the jury could reasonably conclude that the 200 bricks of heroin Roberts procured from Antonio on August 10, which Roberts either distributed to Cox and Taylor or possessed with the intent to distribute, contained approximately 200 grams of heroin. Special Agent Kolvek also testified that she would expect 1,000 bricks to contain approximately one kilogram of heroin. Tr. 89:20–90:19. Accordingly, the jury could reasonably conclude that the 1,400-brick transaction Roberts planned with Antonio and Taylor, which ultimately failed to materialize, itself consisted of more than one kilogram of heroin.

* * *

Roberts did not introduce any evidence in his defense. The Court's review of the evidence is therefore limited to that which the Government introduced in its case in chief.

    2.    *Wimbush*

The Government also presented sufficient evidence from which a rational jury could find Wimbush guilty of conspiracy to possess with intent to distribute 100 grams or more of heroin.

    a)    Elements One and Two: Agreement and Membership

The Government presented evidence sufficient to establish that Wimbush entered an agreement to distribute heroin for profit with Taylor—and, by extension, Antonio—as well as Hall.

First, certain wiretap calls and other evidence allowed the jury to reasonably find that Wimbush was a member of an agreement to distribute heroin for profit that included David Antonio, Jakir Taylor, and Quiana Welch.[16] The evidence shows that Antonio was distributing heroin to Taylor, and that Taylor was redistributing heroin procured from Antonio to Wimbush, either directly or through Welch. Taylor's agreement with Antonio to distribute heroin is evident from the wiretap calls discussed *supra* in connection with Roberts. *See, e.g.*, Govt. Ex. 1012 (August 10, 2018 call between Antonio and Taylor in which Antonio tells Taylor he had "two so far," one of which was called "Obsession," and that "by tomorrow" he would "have like another two"); *see also* Govt. Ex. 1102 (August 11, 2018 call between Taylor and Hall in which Taylor tells Hall he "got a hundred yesterday" and had "Obsession right now," and that his "Papi" was "'bout to give [him] another

---

[16] There is a reasonable inference that references on many of the wiretap calls to "Young," "Young Money," and "Money," are references to Wimbush. *See, e.g.*, Govt. Ex. 1107 (September 6, 2018 call between Quiana Welch and Jakir Taylor in which Welch tells Taylor, in discussing the September 6 vehicle stop, that the car was in her "brother['s] name" and that officers "locked up" Welch's "brother," to which Taylor replied: "They locked Young up?"); Govt. Ex. 218-B (title to the vehicle pulled over on September 6, 2018, which is in Timothy Wimbush's name).

hundred today"). Further, the jury could have reasonably inferred that Wimbush procured heroin from Taylor, which Taylor had obtained from Antonio. After stopping Wimbush's vehicle on September 6, 2018, officers discovered "57 bricks of heroin" bearing the stamps "Golden State," "Kawasaki," "Remy Martin," and "Capital One" inside a trap compartment hidden under the back seat. Tr. 411:8–416:13. Certain wiretap calls show that Taylor was distributing heroin during the week before Wimbush's arrest bearing stamps matching those discovered in the trap compartment of Wimbush's vehicle. *See* Govt. Ex. 1086 (August 29, 2018 call between Taylor and an unidentified male in which the male asked Taylor "what stamp" he had, to which Taylor replied, "Empire and Capitol One"); Govt. Ex. 1087 (September 4, 2018 call between Taylor and an unidentified male in which Taylor told the man he had "Remy Martin"). And when officers searched Antonio's residence on October 25, 2018, they recovered stamps bearing the labels "Capitol One" and "Remy Martin," among others. Tr. 437:16–438:3; 454:5–457:1.[17]

Other wiretap calls provide further evidence of the conspiratorial relationship between Wimbush, Taylor, and Welch. Shortly after officers stopped Wimbush's vehicle on September 6, 2018, Taylor and Welch discussed the stop, as well as the contents and occupants of Wimbush's vehicle. *See* Govt. Exs. 1107, 1109. During a call intercepted on September 6, Welch and Taylor revealed their knowledge that heroin and four firearms were hidden inside the trap compartment. *See* Govt. Ex. 1107 ("JT: . . . they ain't find nothin though, right? QW: . . . they going to, they ain't find it yet, though."); *id.* ("QW: . . . what's in that car, it's about four hand things . . . [a]nd there's some

---

[17] Wimbush also made statements on calls intercepted from the Mercer County Correctional Facility after his arrest that further support the conclusion that he procured heroin from Taylor. *See* Govt. Ex. 2005 (September 15, 2018 call including Wimbush and Welch on which Wimbush stated to Welch that the "shit" that "Jak got is, uh, trash[,]" to which Welch responded, "No it's not. . . . nobody I gave it to ever complained."); Govt. Ex. 2006 (September 20, 2018 call between Wimbush and Welch during which Wimbush commented that "Jak still bervin' that garbage out there").

packs in there[,] . . . like 80 in there. JT: I already know."). On the same call, Welch and Taylor discussed the occupants of the vehicle in a manner suggesting their membership on Welch and Taylor's "team." *See id.* ("JT: Who'd they lock up?" QW: . . . They got Trip, Hootie, . . . Jubri [West], and my brother [*i.e.*, Wimbush]."); *id.* ("JT: They locked Young [*i.e.*, Wimbush] up? QW: Yeah. He was in the car when it got pulled over."); *id.* ("QW: . . . they just took a bitch whole team out, they done aired half of the team, . . . and the other half of the team locked up. It's over."). When Welch and Taylor spoke by phone about the vehicle stop again the next day, September 7, they confirmed their knowledge of the heroin and firearms officers discovered in the trap compartment. *See* Govt. Ex. 1109 ("QW: . . . they found eight poles and . . . eighty packs. . . . JT: You said they found it? QW: Yeah. JT: Oh my God. . . . They ain't find that big bitch. QW: That, yes they did. That was in there.").

Second, the Government introduced evidence from which the jury could conclude that Wimbush entered an agreement with Hall to procure and re-distribute heroin for profit. On a call between Hall and Taylor intercepted on August 10, 2018, Hall suggested that he planned to obtain "Golden State" and "Kawasaki." *See* Govt. Ex. 1101. Hall also told Taylor that "Money"—a reference to Wimbush—wanted to "buy fifty" from Hall. *See id.* The next day, Hall confirmed to Taylor that he had obtained "seventeen packs" of "Golden State" and discussed a possible meeting with "Young," a reference to Wimbush. *See* Govt. Ex. 1102. On another call with Taylor approximately one week later, Hall recounted a time when Wimbush attempted to purchase what the jury could reasonably infer to be heroin from Hall, which ultimately failed to materialize. *See* Govt. Ex. 1104 (August 17, 2018 call on which Hall explained that "Money" "wanted eighty" and gave Hall "five thousand" but that Hall would not have "that shit . . . ready [until the next day]," so Wimbush took his money back). Wimbush also provided evidence of his agreement with Hall to distribute heroin on a jail-call with Welch and another individual called "Ghost." *See* Govt. Ex. 2005.

Wimbush told "Ghost" to "holla at Buddha"[18] and "see what the name," to which Welch responded, "Boy you talkin' crazy on these phones." *Id.* From this evidence, the jury could reasonably infer that Wimbush was attempting to purchase heroin from Hall at a time when Hall was distributing heroin bearing "Golden State" and "Kawasaki" stamps, and that Wimbush obtained the heroin bearing "Golden State" and "Kawasaki" stamps discovered in the trap compartment of his vehicle from Hall.

Wimbush's position that the evidence establishes only a buyer-seller arrangement is unavailing. Multiple *Gibbs* factors support the conclusion that Wimbush "was *part* of a conspiracy rather than in a mere buyer[-]seller relationship." *Bailey*, 840 F.3d at 108 (quoting *Gibbs*, 190 F.3d at 199) (emphasis in original). The 57 bricks of heroin discovered in Wimbush's vehicle bearing stamps associated with Antonio, Taylor, and Hall evidence "transactions involv[ing] large amounts of drugs." *Gibbs*, 190 F.3d at 199; *see also* Tr. 89:10–19 (testimony explaining that one brick typically contains 50 "single-use dose[s]," implying that the 57 bricks in Wimbush's vehicle contained approximately 2,850 doses). Certain wiretap calls also provide evidence of "mutual trust," *Gibbs*, 190 F.3d at 199, among Wimbush, Taylor, and Welch. For example, the calls would permit the jury to infer that Taylor and Welch were aware of the heroin and firearms discovered in Wimbush's vehicle, *see* Govt. Exs. 1107, 1109, demonstrating a level of familiarity with Wimbush's operations that a one-time supplier would be less likely to possess. The evidence also shows that "the length of affiliation between" Wimbush, Taylor, and Hall that was centered on heroin distribution spanned approximately one month and involved "repeated, familiar dealings." *Gibbs*, 190 F.3d at 199; Govt. Ex. 1101 (August 10, 2018 call on which Hall notified Taylor that "Money wanna buy fifty" and discussing a previous instance in which Wimbush attempted to purchase narcotics from

---

[18] Based on testimony from Special Agent Kolvek, the jury could reasonably conclude that "Buddha" is a nickname for Hall. *See* Tr. 218:7–10.

Hall); Govt. Exs. 1102, 1104 (August 11 and 17, 2018 calls discussing narcotics transactions between Wimbush and Hall); Govt. Ex. 1107 (September 6, 2018 call between Welch and Taylor in which Welch refers to Wimbush as part of the "team" and discusses the implications of his arrest).

Certain *Gibbs* factors are either absent or weigh against Wimbush's membership in the conspiracy, but these factors are not dispositive. The evidence does not clearly establish "whether there [wa]s an established method of payment" or "the extent to which transactions [we]re standardized." *Gibbs*, 190 F.3d at 199. Further, some evidence suggests that Wimbush did not purchase drugs on "credit." *Id.*; Govt. Ex. 1101 (wiretap call implying that Hall refused to sell heroin to Wimbush when he did not bring enough money). However, *Gibbs* does not hold that every factor must support membership for a jury to conclude that the defendant was engaged in more than a buyer-seller arrangement. Rather, *Gibbs* directs courts "to consider 'whether the buyer can be said to have a stake in the larger conspiracy,' beyond the buyer/seller relationship." *Bailey*, 840 F.3d at 109 (quoting *Gibbs*, 190 F.3d at 198, n.3). Here, Wimbush's "repeated, familiar dealings" with Hall, Welch's and Taylor's intimate familiarity regarding Wimbush's possession of heroin and firearms, and Welch's reference to Wimbush's membership on her "team," *see* Govt. Ex. 1107, provide sufficient evidence of his "stake" in the conspiracy.

> b)   Element Three: Unity of Purpose and Intent to Achieve the Objectives of the Conspiracy

The foregoing evidence is also sufficient to establish that the co-conspirators shared a "unity of purpose," and that Wimbush had an intent to achieve the objectives of the conspiracy. *See Bailey*, 840 F.3d at 108. A "defendant's knowledge of the conspiracy's specific objective . . . need not be proven by direct evidence . . . [and] is often proven by circumstances." *Caraballo-Rodriguez*, 726 F.3d at 431. Here, the circumstantial evidence of Wimbush's intent to achieve the conspiracy's objective is substantial. Officers discovered 57 bricks of heroin in a hidden trap compartment of

Wimbush's vehicle bearing stamps that Antonio, Taylor, and Hall were distributing in the weeks before Wimbush's arrest. Wiretap calls confirm that Wimbush attempted to purchase large quantities of heroin from Hall during the same period. Other wiretap calls imply that Welch and Taylor were intimately familiar with Wimbush's operations, including the heroin and firearms discovered in his vehicle, and that Welch viewed Wimbush as a member of her "team," whose central purpose was heroin distribution.

Further, Wimbush provided evidence of his intent to advance the conspiracy's objectives during calls with Welch that were intercepted from the Mercer County Correctional Facility. On those calls, a "rational jury," *see Caraballo-Rodriguez*, 726 F.3d at 434, could reasonably conclude that Wimbush revealed his knowledge of the quality of the heroin Taylor was distributing, describing it as "trash" and "garbage," and that he directed an associate to contact Hall regarding the types of heroin available for distribution at that time. *See* Govt. Exs. 2005, 2006. In combination with the other evidence outlined *supra*, the jury could conclude based on Wimbush's jail-call statements that he intended to advance the conspiracy's objective of distributing heroin for profit. Although Wimbush's apparent distaste for Taylor's heroin is also consistent with the conclusion that he declined to purchase heroin from Taylor, *see* Tr. 980:6–12, such a possibility is not a basis upon which the Court may overturn the jury's verdict, as "it is not the business of a reviewing court to play the role of an extra juror in assessing all the possible inferences that *could* be drawn." *Caraballo-Rodriguez*, 726 F.3d at 434 (emphasis in original).

      c)      Element Four: Weight

Finally, the evidence was sufficient for the jury to conclude "that the quantity of heroin involved in the conspiracy that was reasonably foreseeable to [Wimbush] was 100 grams or more." *See* ECF No. 684 at 4. Officers discovered more than 57 bricks of heroin in the trap compartment of Wimbush's vehicle on September 6, 2018. *See* Tr.414:1–417:13 (testimony discussing 57 bricks of

heroin in one lunch bag, as well as additional bricks in other lunch bags discovered in the trap compartment). An expert testified that within those 57 bricks, the packs stamped "Kawasaki" and "Golden State" contained approximately 40 grams of heroin. Testimony of Brandon Pittam, Tr. 723:21–726:22. The jury could also reasonably infer based on wiretap calls between Taylor and Hall that Wimbush had attempted to purchase 50 and 80 bricks of heroin from Hall on separate occasions before his arrest. *See* Govt. Ex. 1101 (August 10, 2018 call on which Hall informed Taylor that "Money" wanted to "buy fifty" from Hall); Govt. Ex. 1104 (August 17, 2018 call on which Hall recounted to Taylor an occasion on which Wimbush "wanted eighty" and gave Hall "five thousand" but then took back his money because Hall's supply was not ready). And as discussed *supra*, Special Agent Kolvek testified that, based on her experience in this case, a brick typically contained one gram of heroin. Tr. 89:20–90:2. Accordingly, the jury could reasonably conclude based on the amount of heroin discovered in Wimbush's vehicle, combined with the attempted transactions captured on the wiretap, that Wimbush could have foreseen that the conspiracy involved at least 100 grams of heroin.

Thus, Wimbush's Rule 29 motion at the close of the Government's case is denied.

* * *

The evidence is also sufficient to find Wimbush guilty on Count One even when considering the evidence he introduced in his defense. Wimbush called one witness, Robert Zimmerman, a private investigator who inspected Wimbush's vehicle after it was impounded following Wimbush's arrest. Tr. 943:16–945:14. Mr. Zimmerman testified that, based on his inspection and photographs of Wimbush's vehicle that he reviewed, the front windshield "appear[ed] to have some tinting at the top," which was "probably a factory tint," whereas the tint on the side-door windows is "darker" and "more of an after-market tint." Tr. 947:12–17. He testified further that whereas "it was very difficult to see in through the side and rear windows[,]" it was possible to "see in through the front

windshield," and the "steering wheel" and "head rests . . . on the passenger side" were visible. Tr. 948:4–11. Zimmerman's testimony may undermine the credibility of Officer Maldonado, who initiated surveillance of Wimbush's vehicle before it was stopped on September 6, 2018. Officer Maldonado testified that he was looking out the back windshield of his own vehicle and was parked directly in front of Wimbush's vehicle and when he observed Williams enter the front passenger seat. Tr. 394:2–396:2. But he claimed that he was unable to see Wimbush in the driver's seat through the front windshield of Wimbush's vehicle, Tr. 394:12–15, a proposition Zimmerman's testimony undermines given Zimmerman's ability to see through the front windshield. Nevertheless, Zimmerman's testimony does not negate the sufficiency of the evidence on Count One, as the Court may not weigh the "credibility" of a witness on a Rule 29 motion. *See Caraballo-Rodriguez*, 726 F.3d at 430. Moreover, even assuming Officer's Maldonado's testimony was inaccurate, the evidence discussed *supra*, including the wiretap calls and heroin discovered in Wimbush's vehicle, are sufficient to find him guilty of conspiracy.

### B.     Count Two

Roberts is charged in Count Two with distribution, and possession with the intent to distribute, 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). *See* ECF No. 677. He contends that the evidence is insufficient to find him guilty on this count because, he claims, the Government only adduced evidence that he possessed the 57 grams of heroin recovered from Kaleib Cox's vehicle on August 10, 2018, not 100 grams or more. *See* Tr. 995:23–998:11. The Government maintains that the evidence is sufficient because, in addition to the 50 bricks discovered in Cox's vehicle, other evidence establishes that Roberts obtained 200 bricks from Antonio and distributed 100 of those bricks to Roberts, amounting to at least 100 grams of heroin. *See* Tr. 1003:9– 1006:6. I agree with the Government that the evidence is sufficient to sustain the charges of possession with intent to distribute, as well as distribution.

"A conviction for possession with intent to distribute drugs requires that the defendant knowingly and intentionally possessed the drugs with the intent to distribute them." *United States v. Iafelice*, 978 F.2d 92, 95 (3d Cir. 1992). Further, "[b]ecause the weight involved in a violation of § 841(a) increases the statutory penalty, it is an element of the offense that must be proven beyond a reasonable doubt." *United States v. Rowe*, 919 F.3d 752, 759 (3d Cir. 2019). Roberts maintains the evidence does not establish that he possessed 100 grams or more of heroin, which is the weight for which the jury ultimately convicted him in Count Two. *See* ECF No. 684 at 6.

I conclude that the Government presented sufficient evidence from which the jury could find that Roberts possessed with intent to distribute 100 grams or more of heroin on August 10, 2018. As discussed *supra* in connection with Count One, the evidence shows that on August 9, 2018, Roberts informed Taylor that Antonio was preparing "four hundred" and that Antonio had already provided Roberts with a "sample." *See* Govt. Ex. 1010. The following day, August 10, Taylor informed Roberts that Antonio had "two" ready and would have another "two" by the next day. *See* Govt. Ex. 1013. In context, Antonio, Taylor and Roberts were evidently discussing heroin, as Antonio notified Taylor that "the names" he planned to use on the "two" were "Scarface and Obsession." *See* Govt. Ex. 1012. On the afternoon of August 10, Roberts arranged to meet Taylor's associate at a car wash in Trenton. *See* Govt. Ex. 1014. Officer Maldonado testified that he observed Roberts arrive in that area, Tr. 369:14–371:5, and a wiretap call captured Taylor notifying Roberts that he had arrived near the car wash himself. *See* Govt. Ex. 1017. Shortly thereafter, Officer Maldonado observed Roberts meet with Cox, Tr. 371:13–374:22, after which officers discovered the 50 bricks of heroin stamped "Scarface" and "Obsession" in Cox's possession. *See* Tr. 666:8–671:1; Tr. 696:3–6; Govt. Ex. 101. On August 11, Taylor implied on a call with Hall that he had received 100 bricks the day before. *See* Govt. Ex. 1102 (explaining that he "had got a hundred" the day before from his "Papi"). Taylor also further implied that he had obtained part of Antonio's 200-brick supply from Roberts when he asked

Antonio on August 12 to confirm the "names" Antonio had provided, which Antonio verified were "Scarface" and "Obsession." *See* Govt. Ex. 1021. And Roberts provided additional evidence that he distributed heroin to Taylor on August 10 when, on an August 14 call with Taylor, Roberts described the day of Cox's arrest as the day "when I met you . . . and I gave you that shit." *See* Govt. Ex. 1032.[19]

Based on the foregoing evidence, the jury could reasonably conclude that Roberts possessed with intent to distribute at least 150 bricks of heroin on August 10, 2018. And because the Government introduced testimony that a brick typically contained one gram of heroin, Tr. 89:20–90:2, the jury could reasonably conclude that the bricks Roberts possessed on August 10, 2018, contained 100 grams or more of heroin.[20]

### C. Count Four

Count Four charges Wimbush with possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A). ECF No. 677 at 15. To convict a defendant of violating Section 924(c)(1)(A), the Government must prove that:

---

[19] Although Taylor and Roberts often referred to quantities without specifying a unit, the evidence is sufficient, viewed "as a whole," *Caraballo-Rodriguez*, 726 F.3d at 430 (quotations omitted), to conclude that Taylor and Roberts were referring to bricks. In fact, Roberts referred explicitly to "50 bricks" after discussing Cox's August 10 arrest with Taylor. *See* Govt. Ex. 1032. Further, the fact that officers found Cox in possession of 50 bricks of heroin just minutes after meeting with Roberts creates a reasonable inference that Antonio's, Roberts' and Taylor's references to "two" were references to 200 bricks—and not, for example, only two bricks.

[20] While the jury could find Roberts guilty on Count Two based solely on the evidence supporting possession with intent to distribute, *see* Tr. 1096:11–20, the same evidence would also permit the jury to find Roberts guilty of distributing 100 grams or more of heroin. To find Roberts guilty of distribution, the jury must find that Roberts actually "delivered" a controlled substance. *United States v. Rowe*, 919 F.3d 752, 759 (3d Cir. 2019). "Delivery is 'the actual, constructive, or attempted transfer of a controlled substance.'" *Id.* (quoting 21 U.S.C. § 802(8)). "'[S]eparate acts of distribution of controlled substances are distinct offenses under 21 U.S.C. § 841(a),'" and they "may not be combined and prosecuted as 'part of a single continuing scheme.'" *Id.* at 759 and n.3 (quoting *United States v. Mancuso*, 718 F.3d 780, 793 (9th Cir. 2013)). Here, a rational jury could find that Roberts made a single delivery of 100 bricks, amounting to 100 grams or more of heroin, to Taylor on August 10, 2018.

(1) the defendant committed either the crime of conspiracy to distribute and possess with intent to distribute a controlled substance or the crime of possession with intent to distribute; (2) the defendant knowingly possessed a firearm; and (3) the defendant knowingly possessed the firearm in furtherance of the crime of conspiracy to distribute or in furtherance of the crime of possession with intent to distribute.

*Bailey*, 840 F.3d at 112 (citing *United States v. Bobb*, 471 F.3d 491, 496 (3d Cir. 2006)). Wimbush did not move to dismiss Count Three, which charges him with possession with intent to distribute heroin, and for which he was convicted. Nor did he challenge, on this motion, the evidence supporting his possession of the firearms discovered in the trap compartment of his vehicle on September 6, 2018. Rather, he contends that the Government failed to prove that he possessed these firearms in furtherance of any drug crimes. Tr. 981:11–983:13. I conclude that the Government presented sufficient evidence upon which the jury could find that Wimbush possessed the firearms discovered in the trap compartment of his vehicle in furtherance of the heroin possession charge for which the jury convicted him under Count Three.

In assessing whether the evidence satisfies the "in furtherance" requirement, "the 'mere presence' of a gun is not enough." *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004). "[T]he the evidence must demonstrate that possession of the firearm advanced or helped forward a drug trafficking crime." *Id.* To make this determination, courts consider "the following nonexclusive factors . . .: the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Id.* (quotations and citations omitted). In *Sparrow*, officers discovered "a concealed compartment under the floor tiles" of a store to which the defendant possessed a key and for which he was the sole tenant on the lease. *Id.* at 851–52. The compartment contained "large Ziploc bags of marijuana, $140 in cash and a loaded . . . pistol." *Id.* The Third Circuit concluded that the defendant possessed the firearm in furtherance of a drug trafficking crime, in violation of Section 924(c),

because he possessed the firearm unlawfully as a prior felon, the firearm was loaded, and it was located in the same compartment as the marijuana. *Id.* at 854. Further, even though the defendant claimed that the firearm was "not easily accessible" given the need to "pry the floor tiles up with a crowbar," the court concluded that it was "strategically located" because it "was placed so that it would be immediately available for [the defendant's] protection whenever he retrieved drugs or money from the floor compartment." *Id.* at 852, 854.

Based on the *Sparrow* factors, Wimbush possessed the firearms in his vehicle in furtherance of the drug trafficking crime for which he was convicted under Count Three. Like in *Sparrow*, the firearms at issue, here, were stored in a secret compartment, loaded, and located "in the same . . . compartment as [the bricks of heroin]." *Id.* at 854; Tr. 417:25–427:5. Further, just as the defendant in *Sparrow* exercised control over the store where officers found a firearm based on his status as the sole lessee, 371 F.3d at 852, Wimbush was in possession and control of the vehicle containing the firearms underlying Count Four, as his name is on the title to the vehicle, and he was driving the vehicle at the time officers discovered firearms inside the trap compartment. Tr. 399:15–403:3 (testimony that the registration and title to the vehicle were in Wimbush's name); Govt. Exs. 218-A, 218-B (registration and title to the vehicle in Wimbush's name); Testimony of Eliezer Ramos, Tr. 591:22–592:2 (testimony that Wimbush was in the driver seat when officers stopped the vehicle). Wimbush does not contend, as did the defendant in *Sparrow*, that the firearms were "not easily accessible." *Sparrow*, 371 F.3d at 854. But even assuming the firearms were difficult to access given the need to engage the trap compartment, they were nevertheless "strategically located," as they were "placed so that [they] would be immediately available for [Wimbush's] protection whenever he retrieved drugs . . . from the [trap] compartment." *Id.* Accordingly, as in *Sparrow*,[21] "it is reasonable

---

[21] Unlike *Sparrow*, here, the jury did not learn of Wimbush's prior felony until after it convicted him on Counts One, Three, and Four in the first phase of the trial. Nevertheless, this distinction is not

to assume the firearm[s] w[ere] placed in the [trap] compartment for that purpose and w[ere] possessed in furtherance of [Wimbush's] drug activities." *Id.*

Wimbush's contentions otherwise are unconvincing. He first argues that the Government failed to introduce testimony from a drug expert explaining why the drugs discovered in the trap compartment were likely packaged for distribution. Tr. 981:18–982:1. Yet, on this motion, Wimbush did not challenge the sufficiency of the evidence supporting Count Three, which charged Wimbush with possession with the intent to distribute. Moreover, even without testimony from a drug expert, the evidence was sufficient. Testimony at trial implies that the 57 bricks of heroin discovered in Wimbush's vehicle contained approximately 2,850 single-use doses, *see* Tr. 89:10–19, which a rational jury could have concluded were not merely for personal use. Further, the heroin was packaged in bricks, which Special Agent Kolvek testified was the common form of packaging used in Trenton based on her experience in this investigation, as evidenced by heroin she observed following controlled law enforcement purchases. Tr. 89:2–19. Wimbush also contends that, according to the Government's theory, a violent feud involving shootings against Wimbush's associates motivated his possession of firearms,[22] and he maintains that the Government failed to present evidence showing that the shootings were related to drug distribution. Tr. 982:2–983:13. But even without such evidence, the Government presented other evidence from which a rational jury could conclude, based on the *Sparrow* factors, that Wimbush possessed firearms in order to further the drug trafficking crime for which he was convicted.[23]

---

dispositive, as no "single factor" is "required under *Sparrow*." *United States v. Arzola*, 361 F. App'x 309, 313 (3d Cir. 2009) (citing *Sparrow*, 371 F.3d at 853).

[22] The Government and Wimbush stipulated that two shootings occurred in Trenton on September 1 and 2, 2018, during the latter of which Quiana Welch, among others, suffered gunshot wounds. Tr. 1115:13–21.

[23] As discussed *supra*, the evidence Wimbush presented in his defense relates only to the credibility

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motions are **DENIED**. An appropriate form of Order is filed herewith.


Date: January 10, 2022                                    /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         U.S. Chief District Judge

---

of a Government witness, and therefore does not alter the Court's conclusion that a rational jury could find him guilty on Count Four. *See Caraballo-Rodriguez*, 726 F.3d at 430.